F86HGATC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   TRESSA GATTINELLA, et al.,

4              Plaintiffs,

5         v.                              14 CV 5731 (WHP)

6   MICHAEL KORS (USA), INC., et
    al.,
7
               Defendants.
8
    ------------------------------x
9                                        New York, N.Y.
                                         August 6, 2015
10                                       4:00 p.m.

11  Before:

12                 HON. WILLIAM H. PAULEY III,

13                                       District Judge

14                      APPEARANCES

15  TYCKO & ZAVAREEI
         Attorneys for Plaintiffs
16  BY:  HASSAN A. ZAVAREEI

17       – and –

18  KOPELOWITZ OSTROW FERGUSON
         Attorneys for Plaintiffs
19  BY:  JEFFREY M. OSTROW

20       – and –

21  LAW OFFICES OF WAYNE KREGER
         Attorneys for Plaintiffs
22  BY:  WAYNE S. KREGER

23  Paul, Weiss, Rifkind, Wharton & Garrison
         Attorneys for Defendants
24  BY:  LESLIE G. FAGEN
         DARREN WRIGHT JOHNSON

25

F86HGATC

1            (Case called)

2            THE COURT:  All right.  Good afternoon, gentlemen.  I

3    have before me the plaintiff's application for preliminary

4    approval.  Do counsel wish to be heard?

5            MR. OSTROW:  Yes, your Honor.  Jeff Ostrow on behalf

6    of the settlement class.  How would you prefer that we proceed

7    this afternoon?  I could run through the settlement or I can

8    answer questions.

9            THE COURT:  I mean, I've reviewed your proposals.  I

10   guess, first, what is the anticipated cost of settlement, the

11   settlement administration here?

12           MR. OSTROW:  It's approximately $550,000, and we will

13   have a cap on those costs in our final contract with Epic

14   Systems, the administrator that we've selected.

15           THE COURT:  Have you worked with Epic before?

16           MR. OSTROW:  Many, many times.  In fact, counsel,

17   Mr. Zavareei and I, have probably settled ten cases together

18   across the country in the last four or five years; and we've

19   used them almost exclusively on very large cases.  And they've

20   been terrific to work with.  Very efficient, they stay within

21   the cost parameters that we contract with them, and they've

22   done a very good job.

23           THE COURT:  How many Michael Kors outlet stores are

24   there around the country?

25           MR. OSTROW:  I would defer to counsel.

F86HGATC

1          THE COURT:  Approximately.

2          MR. OSTROW:  Couple hundred.

3          THE COURT:  A couple hundred?

4          MR. OSTROW:  Yes.

5          THE COURT:  With respect to the notice that's

6    envisioned, you speak of a newspaper advertisement.  Where's it

7    going to be published?

8          MR. OSTROW:  So the publication portion of the notice

9    which you're speaking of is twofold.  It will be in newspapers

10   and it will be in magazines as well as some -- I should say a

11   third facet, which is Internet advertisements, some targeted

12   cites.  The newspapers and publications will be a national

13   publication in which in the areas in which the -- the outlet

14   stores are located.  So it should cover, you know, nationally

15   and all those areas where those 200 locations are.

16         THE COURT:  How far did discovery progress in this

17   case?

18         MR. OSTROW:  Paper discovery, I would say written

19   discovery, interrogatories, admissions, we exchanged those; and

20   we had pretty extensive informal discovery with respect to

21   damages and data which our experts reviewed in coming to damage

22   models and ultimately assisted us in getting to a figure with

23   these gentlemen.

24         THE COURT:  I ask because when I look at the docket

25   sheet, I see that a stipulation for confidentiality was only

F86HGATC

1   entered in February of this year, and two months later you're

2   advising me that there's a proposed settlement.  So how many

3   documents were produced?

4            MR. JOHNSON:  Your Honor, I don't remember how many

5   pages.  A lot of the document production consisted of taking

6   information that was in databases and reducing it down and

7   creating information that could be provided more easily to

8   plaintiffs rather than giving them reams and reams of paper.

9   So really was getting at the numbers in terms of consumers and

10   sales levels, and things like that.

11            MR. OSTROW:  We had extensive meetings, and there was

12   extensive negotiation based upon the damage aspect of it, and

13   that's really where, after we realized that this case was

14   appropriate for resolution, we wanted to focus on coming up

15   with a figure and understanding their sales numbers, the number

16   of consumers, what we were really talking about, because the

17   data, it's not -- you know, I talked about some cases that we

18   resolved, well, those were cases against defendants in which

19   they were able to provide us with the names and addresses and

20   exactly the amounts of money that were at issue.  This is a

21   different situation in which we had to rely on a significant

22   amount of information that they were able to accumulate based

23   upon their sales and work backwards.  Once we realized it was

24   appropriate for settlement, that's when we started to talk

25   about the damage aspect of it, and that's really when we

F86HGATC

1    focused on it.

2              THE COURT:  When was that epiphany?

3              MR. OSTROW:  I would say within the first few months

4    after the initial complaint was filed, we reached out and

5    decided, let's see if it makes sense before both sides really

6    dive into the pool and get extensively into depositions and see

7    whether or not there's interest.  We do that in all our cases

8    because we believe it's efficient for all parties.

9              THE COURT:  Were any depositions taken on this case?

10             MR. OSTROW:  No.

11             THE COURT:  In your proposed order, you provide for

12   this Court's authorization appointing all three of your law

13   firms as counsel for the class in this case.  Why is that

14   necessary?

15             MR. OSTROW:  Well, all three of the firms have been

16   involved in this case and similar cases that we're working on

17   from the outset.

18             THE COURT:  I don't care about similar cases.  I only

19   care about this case, and I'm trying to figure it out.

20             MR. OSTROW:  Understood.  So all three have been

21   involved from the outset.  All three have had related but

22   different roles involved in this case.  Some of them have

23   relationships more directly with the plaintiffs.  Some have had

24   more relationships dealing with the defense in settlement

25   negotiations.  There is -- a large aspect of these cases is not

F86HGATC

1    just how you get here, it's what you do once you get here.  And

2    if the Court provides that approval, you know what the process

3    entails.  And there's a significant amount of work and time

4    that's going to go into this.  There's significant costs that

5    go into these cases, and I believe that it's appropriate to

6    appoint the three firms that have been involved in these cases,

7    that have been involved in the liability as well as the

8    damages, and there's significant liability with firms that take

9    on the role as class counsel.  So my response would be that

10   it's appropriate for all three.

11           The cases filed in the state of -- excuse me, mere in

12   New York.  We've got plaintiffs in California.  We have

13   licensed California attorneys.  Other firm counsel are not

14   licensed out there necessarily.  We have firms that are

15   licensed here that have pro hac'd in or assisted in bringing

16   other firms in.  So that's kind of the relationship between the

17   three.

18           THE COURT:  Well, look, I'll tell you right now, I'm

19   not authorizing the appointment of three law firm, all right,

20   nor am I going to take on the role of being the protector of

21   the class.  The fact of the matter is that I don't think I need

22   lawyers from Washington, Fort Lauderdale, and New York all

23   present in the courtroom for a motion for preliminary approval,

24   or on any other motion.  So I'm telling you right now, you can

25   decide among yourselves which firm is going to be counsel, but

F86HGATC

1    I'm only authorizing one counsel in this preliminary order.

2    And when the submissions are made, I expect there to be

3    appropriate documentation relating to the attorneys' fees, the

4    experts.  I take it you retained and have paid experts?

5            MR. OSTROW:  Yes.

6            THE COURT:  All of that is going to have to be

7    described in excruciating detail to me.

8            MR. OSTROW:  And it will be.  And we understand.

9            THE COURT:  I mean, I have two plaintiffs who you

10   propose to give incentive awards to.  They haven't appeared for

11   a deposition.  They never showed up here.  They're just the

12   instrument by which this case got here.  You can include that

13   in your proposal, but I may not be inclined to approve that.

14           MR. OSTROW:  May I respond to your point about why

15   three counsel?

16           THE COURT:  Yes.

17           MR. OSTROW:  And I'm not asking you to necessarily --

18   you're going to make your decision.  I'm not asking you to

19   reconsider.

20           THE COURT:  Right, I already have made my decision.

21           MR. OSTROW:  But it's important, you asked why there's

22   three here today.  When we come here today, we don't know

23   whether you're ultimately going to enter an order approving it

24   or not.  We haven't necessarily discussed the merits of the

25   settlement which I think are important because I think it's an

F86HGATC

1    excellent settlement.  When we take a case, we are prepared to

2    try the case.  We hope that we can reach a resolution early.

3    That's really beneficial for the class.  We believe that we've

4    done that here.  But in the event that we don't, we have to be

5    prepared to do what we set out to do, and that's to try the

6    case.  They're extremely expensive, as this Court knows.  They

7    take a lot of time.  And it's nice when a firm has hundreds of

8    lawyers that you're defending against, but we don't, so we pool

9    resources, we pool time, and we prepare it to go to war.  So

10   that's why when we come before your Honor, there's three firms

11   and that we ask that you approve it.  I understand the ruling.

12   I respect that.

13            THE COURT:  I understand how it works.  I understand

14   what the mechanics are, but there isn't much there.  What I see

15   in this case, okay, the case was filed on July 25 of last year.

16   All right.  If I remove from the docket sheet all the motions

17   for admission pro hac vice and all the reports by the clerk's

18   office as to filing errors by both sides in this case, instead

19   of having an 11-page docket sheet, I'd have a docket sheet that

20   I could quickly read and analyze and understand to be about two

21   pages.  We had an initial conference on October 31 in which I

22   sat and talked to the parties.  The next thing that happened

23   was the filing of a motion, essentially unopposed motion, to

24   file a second amended complaint at the end of December.  And

25   then there was nothing until the stipulated confidentiality

F86HGATC

1    order was entered in February.  What documents were produced by

2    the defendants or other information, Mr. Johnson, before the

3    confidentiality order was entered?

4              MR. JOHNSON:  My recollection, your Honor, is that we

5    had exchanged discovery requests with each other, including

6    document requests and interrogatories and informal discovery

7    requests as well, but that nothing was actually produced until

8    the day that was entered, and that's what led us to --

9              THE COURT:  That would have been my conclusion, too.

10   So whatsoever happened in this case in terms of analysis

11   happened between February 6 and April 8 when I was notified.

12   So I'm telling you now about some of the issues.

13             How many people are going to make up this class,

14   Mr. Ostrow?

15             MR. OSTROW:  I mean, we in the papers put tens of

16   thousands.  The answer is it could be hundreds of thousands.

17   It could be a million.  It's probably a million.  The return

18   rate on what we expect is, obviously, significantly less.  We

19   think that's going to be a very, very significant recovery for

20   each class member.  We've made an extremely easy claims

21   process.  Every dollar's going back out.  There's no reversion.

22   There's a low threshold for recovery.  You attest that you

23   purchase the product within the list of products, you'll get a

24   percentage of the settlement fund.  If you have purchase

25   receipts with a dollar amount, you can get additional money

F86HGATC

 1    above and beyond just the individuals that attest to it.  It's

 2    an extremely fair settlement.  And one of the hallmarks that

 3    we're pretty proud of, and it's the first time this has

 4    happened in any of these cases, is there's a change that'll be

 5    taking place at all the outlets.  They're actually going to be

 6    educating their consumers, making a change in the price tag,

 7    the very conduct we complained of which is this MSRP

 8    comparative pricing.  They're going to change the wording,

 9    they're going to use language that people understand, and

10    they're going to have in-store displays which define the

11    language on the price tag.  And I applaud them for doing it

12    because it's a big move.  They will probably lose revenue as a

13    result of it.  It will be an industry leader.  And it's not as

14    simple of a case as we just got together and settled the case

15    shortly after doing it.  It's a big deal in this industry.  And

16    I hope that it's going to continue with the other cases and the

17    other outlets, the other retailers.

18              THE COURT:  Why does Michael Kors have to wait six

19    months to make that change in the store?

20              MR. OSTROW:  I'll defer to counsel.

21              THE COURT:  Yeah.

22              MR. OSTROW:  My understanding is they're going to

23    attempt to do it earlier, and I think the language is that we

24    would -- that they could do it earlier, and I believe that they

25    were.

F86HGATC

1          MR. JOHNSON:  That's exactly right, your Honor.  I

2     think their intention is to do it as soon as they get the

3     signal from your Honor that, in fact, the settlement is going

4     to go through, but they want to do it as soon as at all

5     practical.

6          THE COURT:  In terms of getting notice to the people

7     who may have claims here, why can't Michael Kors post notice in

8     its outlet stores?  Wouldn't that be the very best place to let

9     Michael Kors' customers know that they may be able to assert a

10    claim?

11         MR. OSTROW:  Is the question to me, your Honor?

12         THE COURT:  Well, it's really a question for Mr. Fagen

13    and his colleague.

14         MR. FAGEN:  Your Honor, we think --

15         THE COURT:  I'm sure you don't want to do that.

16         MR. FAGEN:  We do not want to do that.

17         THE COURT:  But wouldn't that be a really good way,

18    Mr. Fagen to get notice to the people who were harmed?

19         MR. FAGEN:  Maybe yes, maybe no.  The members of the

20    class may not be the people who are shopping in a particular

21    outlet today.  And I also tell you the notice provisions in the

22    settlement are fairly aggressive including the use of our

23    mailing list to find out who was involved at the stores and

24    consumers during the relevant period of time.

25         So, no, we don't want to do it for obvious reasons,

F86HGATC

1    but I don't think we're doing something here that's going to be

2    much concealed from our consumer base.  We're talking about a

3    fairly aggressive notice program as against precedence in the

4    industry.

5              THE COURT:  Does the mailing list include any e-mail,

6    customer e-mail lists?

7              MR. FAGEN:  I think it does, your Honor.  Your Honor,

8    just a couple of comments, if I may, at this moment?

9              THE COURT:  You may.

10             MR. FAGEN:  I take your Honor's points from the

11   questions you've raised.  My recollection of how this evolved

12   starts with our October conference before you, your Honor, at

13   which time, obviously, the subject of resolution came up.  I

14   remember talking to you about the Polo Ralph Lauren settlement

15   that we, by coincidence, handled years ago.  And when we left

16   this courthouse, we started the conference.  And it was

17   tortured with requests for oral/written data, computers for

18   weeks, multiple meetings, till we realized that we were at such

19   war that we enlisted Eric Green, the mediator, who spent an

20   enormous amounts of time analyzing the case, asking for

21   information, meeting with the parties, negotiating, helping us

22   to negotiate.  So I don't want your Honor to come to any

23   conclusion that this was a quickie or that this was easy or

24   that this was some kind of a Peppercorn Settlement.  This, in

25   our view -- I mean, your Honor may recall we said in October we

F86HGATC

1   never really thought very much of this claim.  I know they'd

2   violently disagree, and we very much respected the arguments in

3   favor of class certification.  So as we look at this, my

4   colleague used the word "excellent."  I would call it a

5   generous settlement given the merits of the claim, and I would

6   say that our adversaries here were quite aggressive in

7   representing the interests of the class and spent a great deal

8   of time.  As your Honor will know better than I, some cases

9   settle without expenditure of dollars, hours, discovery,

10  deposition.  When you're dealing with professionals, you can

11  cut to the chase, and these guys knew their claim and they got

12  the data out of us, which we weren't thrilled to give them huge

13  amounts of sensitive information about what their damages

14  claims might be constructed to be.

15           So I don't love this deal because I didn't love the

16  merits, but I think there's something to be said about settling

17  a case efficiently and early; and I think the number is quite

18  generous.  And more than that, we're allowing these plaintiffs

19  in the class to get cash.  That's never happened in these kind

20  of consumer cases before, to my knowledge.  The Polo Ralph

21  Lauren settlement years and years ago didn't have cash and

22  didn't have half the ruckus that these guys have caused.  And,

23  also, these class members who come forward and get their cash,

24  they keep the goods.  We could end up paying 100 bucks to

25  somebody who bought a couple pairs of jeans.  They still have

F86HGATC

1   the jeans, but they get the money.  And on top of that, we're

2   talking about industry-leading signage, both at point of sale

3   and on the garments.  Nobody else, to my knowledge, has settled

4   a case in this field with that kind of remedy.  So excellent

5   settlement, no; but generous settlement, yes, with some

6   plaintiffs' lawyers who, I think, did their homework in an

7   efficient way and got the data they wanted out of us.

8           MR. ZAVAREEI:  Your Honor, may I be heard?

9           THE COURT:  Yes, Mr. Zavareei.

10          MR. ZAVAREEI:  So, your Honor, I'd just like to talk a

11  little bit about the concerns and questions you have with

12  respect to the timeline as Mr. Ostrow and Mr. Fagen have

13  already addressed.  So it is true that if you look at the

14  docket, there's not a lot of litigation activity going on, and

15  I think that was directly a product of the hard negotiations

16  that were going on at the same time.  It doesn't always happen

17  that way, your Honor.  And I know you don't want to necessarily

18  hear about our other cases; and for reasons that we don't want

19  to prejudice our other cases, we don't want to also stand here

20  before you and tell you about all the difficulties that are

21  inherent in a case of this kind.  But suffice it to say that we

22  are experienced litigators who are aware of significant

23  obstacles to winning this case.  But we had, in this particular

24  instance, a defendant that had for whatever reason, a

25  motivation to talk about settlement.  And for that reason, in

F86HGATC

1   order to build on that, we didn't go all out with discovery

2   wars and engage in battles.  We built a constructive

3   relationship, hard hitting and adversarial, but a constructive

4   relationship.  We have other cases where we're pursuing the

5   exact same theory, your Honor, where we're filing motions,

6   taking depositions, battling head to head, and those cases

7   might not resolve for years.

8          So I understand your Honor's concerns, but I think it

9   is important to understand that we are not here settling

10  without a lot of discovery and a lot of information because

11  this is some sort of cakewalk.  That is not what happened.

12  There was a lot of work that went into this case, and I think

13  both sides realized that there's significant risks.  And we

14  have a lot of experience litigating class actions between the

15  three of our firms on plaintiffs' side.  We've obtained

16  excellent results in other cases.  And when we do have a

17  defendant that is motivated for business reasons to settle

18  early, we want to engage with them.  We want to work with them

19  to see if that is possible.  And as Mr. Fagen pointed out, it

20  was not easy.  There was a lot of back and forth.  There were

21  in-person meetings.  And Eric Green, one of the best mediators

22  in the country, was finally able to get us to an agreement.

23  Had that not happened, your Honor, trust me, you would have

24  seen a very thick, long, difficult process in this court with

25  battles over discovery.  It was just beginning, fortunately, we

F86HGATC

1    were able to shortcut that and get an excellent result for this

2    class.

3              THE COURT:  What do the plaintiffs estimate the

4    potential damages to be here if you went all the way and

5    prevailed at trial?

6              MR. OSTROW:  Part of the difficulty in these cases,

7    I'll be honest with you, is that there's no body of case law

8    out there yet that defines what the appropriate measure is.  So

9    what would we like to say?  We'd like to say it's a billion

10   dollars and you've got to give us all our money back for all

11   the purchases.  Who's going to buy that by these people that

12   are sitting there now?  Could it be the differential between

13   what they say the original price is and what the person got --

14   they actually paid?  Could be that.  Could it be some -- you

15   know, one of the models that our expert looked at was there was

16   an average percentage markup, then you have to take into

17   account, you've got the product; you've used the product.  I

18   fall back and say these gentlemen say that it's zero.  So we

19   would put forth probably three or four different models, and I

20   don't know what would be accepted.  I do know that when you get

21   to keep the product and you've worn the product and you're

22   going to walk away and, my best guesstimate, these people could

23   walk away with 30, 40, 50, 60, 70 dollars, that's pretty good.

24             So, like I said, probably could be a billion dollars,

25   it could be a few million dollars.  But we're kind of making

F86HGATC

1    our way down a path that hasn't been walked by any other

2    people.  And maybe back in the Polo settlement they did that,

3    but that was years and years ago.  This is the first case in a

4    wave of these case where, like I said, I think the whole

5    industry's going to change.  I hope the next one they'll pay

6    more, whoever that is.  But the reality is I think it's going

7    to be a very good settlement, and I understand all your

8    concerns here today.  I also know that we're only seeking

9    preliminary approval.  And I know this is a fair and reasonable

10   settlement.  I know we've done our homework.  I know we'll have

11   things tightened up for you if you allow us to go forward with

12   notice, final approval.

13         I know that you've got to look at the range of what

14   the damages are, which is what you just asked, and the damages

15   could be anywhere from nothing to a billion dollars.  So I know

16   that it's within that range.  And in this circuit, that's

17   sufficient for the Court to give the nod to go ahead and, you

18   know, move forward.  And if you don't like what you see later

19   or you do, we take our role very, very seriously.  And I'll

20   tell you that I've probably done two dozen of these preliminary

21   approval arguments, and this is the first time I've been asked

22   the questions that you're asking.  They are very good

23   questions.  A lot of times they'll come at the end, but I think

24   at the beginning's okay, too.  And I understand them, but these

25   three firms aren't three firms that you'll ever see an opinion

F86HGATC

1    written about where those questions that you're trying to cut

2    off, you know, we just don't do that.  We'll get receipts for

3    our expenses.  You're not going to see first-class travel.

4    You're not going to see any of those things.  It's not about

5    that.  It's about getting a settlement for the class.  I say

6    excellent; he says generous.  That's his job.  He can't stand

7    up here and say it's excellent.  He represents the defendant.

8    But it is an excellent settlement.  I think it's a very rich

9    settlement.

10          If your Honor has any questions with respect to any of

11   the other parts of the settlement, be more than happy to answer

12   them.

13          THE COURT:  At this point, I don't.  You're going to

14   have to fill in the details in your subsequent motion for

15   approval, and we'll see what comes out after notice is issued.

16   I just want to highlight to you that I may have significant

17   qualms about incentive payments.  And because many things are

18   merged into this order of preliminary approval, including class

19   certification and the appointment of counsel, I feel that I

20   have to take that issue on right now, and that's why I made it

21   clear to you.  You decide among yourselves, but paragraph 9 of

22   the proposed order must be changed.  Select one firm as class

23   counsel in this case.  I'm indifferent to who among you it is.

24   I'm confident you're all fully qualified.  But as the judge

25   presiding over the matter, I'm not signing off on this at the

F86HGATC

1  conclusion of an action.  And I realize there's significant

2  work that needs to be done in terms of administering the

3  settlement.  And the proposed -- the published notice in your

4  proposed list to be completed by August 1, that date's come and

5  gone, so that needs to be changed.  I am prepared to put the

6  matter down on November 2.

7        MR. OSTROW:  I would say that wouldn't -- I shouldn't

8  have cut you off.

9        THE COURT:  No.

10        MR. OSTROW:  November 2 for final approval hearing?

11        THE COURT:  Right.

12        MR. OSTROW:  We won't be able to accomplish motions

13  and do the other things.  I would say the earliest is

14  probably -- I'd hopefully be on vacation -- middle of December.

15  And if you want to even be safe, make sure we don't have to

16  come back and ask permission to extend deadlines, I would say

17  early January would be appropriate.

18        THE COURT:  You want to do it early January?

19        MR. OSTROW:  Do it whenever you tell us to be here or

20  want us.  I have that order on a flash drive if it's helpful

21  for anybody as well.

22        THE COURT:  How about January 7 at 11:00 o'clock?

23        MR. OSTROW:  Perfect for us.

24        THE COURT:  All right.

25        MR. FAGEN:  I'm fine.

F86HGATC

1              THE COURT:  You want to submit a revised preliminary

2      approval order modifying the dates in paragraph 9?

3              MR. OSTROW:  Yes, your Honor, we'll do so.

4              THE COURT:  Anything further?

5              MR. OSTROW:  No.  All your points well-taken.  Thank

6      you.

7              THE COURT:  Anything further?

8              MR. FAGEN:  No, your Honor.

9              THE COURT:  All right.  Obviously, it's always good to

10     have a settlement.  I'm going to be very interested to see what

11     the response is from the class after the notice goes out.  Too

12     often that's where things break down.  And I really don't

13     like the notion of having to invoke the doctrine of cy-pres

14     where substantial money is left in a fund.

15             MR. OSTROW:  And the reason -- the way we wrote the

16     settlement agreement, it was cy-pres or a second distribution.

17     Obviously, you'll decide which one.

18             THE COURT:  Right.  At some point in time, costs of

19     second distributions become a game of diminishing returns.  But

20     I have a case now, a rather ancient case, in which there's a

21     settlement -- a multimillion-dollar settlement fund, and after

22     several years of outrage only $25,000 in claims have been

23     submitted.  Smith Barney transfer litigation.

24             MR. OSTROW:  Not involved in that one.

25             THE COURT:  No, you're not.

F86HGATC

1          MR. OSTROW:  No.  But I will tell you that you're

2     right, at some point you've reached the point of diminishing

3     returns.  And I guess if we get to a point of diminishing

4     returns, then that means enough of those checks were cashed

5     because there will just be de minimis amount level left.  All

6     these cases we talked, we did second distributions, all the

7     people that got money got a second round.

8          THE COURT:  And in this settlement there's no

9     reversion to the defendants; correct, Mr. Fagen?

10          MR. FAGEN:  I believe that to be absolutely correct.

11          THE COURT:  Okay.

12          MR. OSTROW:  Yes, that was nonnegotiable.

13          THE COURT:  All right.  Because my notion of cy-pres

14     is the United States treasury, okay, because you can invoke the

15     Jeremy Bentham's principle, which I've invoked in a recent

16     opinion in the Research Analysts cases in which $100 million

17     was left on the table.  The most good for the most people was

18     sending it to the U.S. treasury, and that's what I did.  All

19     right.

20          MR. OSTROW:  Thank you.

21          THE COURT:  Thanks.

22          MR. ZAVAREEI:  Thank you, your Honor.

23          THE COURT:  Have a good afternoon.

24          (Adjourned)

25